Edward M. Horey J.
On August 23, 1973, Leah Whiting executed a general statutory power of attorney naming as attorney in fact one Elsie Stuhlmiller a long time friend and a former business associate of Mrs. Whiting’s husband.
As they developed, the principal duties of the attorney in fact were to conduct all necessary business transactions for Mrs. Whiting with the Marine Midland Bank-Western, executor of the estate of Mrs. Whiting’s deceased husband.
All transactions between the attorney in fact and the executor bank relative to the estate administration were harmonious until April 3, 1974. At that time, upon advice of its attorneys, the executor bank refused to honor the power of attorney and ceased to recognize Mrs. Stuhlmiller as an authorized attorney in fact for Mrs. Whiting. This abrupt change of relationship and recognition resulted solely from advice given to the representatives of the executor bank and to the Surrogate’s Court of Cattaraugus County by one Flora H. Welch, Senior Patient Resource Agent for the Department of Mental Hygiene of the State of New York. That advice of Mrs. Welch was contained in a letter dated March 21, 1974 addressed to the Surrogate’s Court of Cattaraugus County with a copy to the Trust Officer of the executor bank. It stated as follows:
"This patient was admitted to Gowanda State Hospital December 29, 1973 and discharged to the Extended Care Facility of Tri County Hospital, Gowanda, on March 13, 1974. Prior to her discharge this office had requested that the Attorney General petition for the appointment of a committee. We strongly felt that a committee was needed in view of *873 the physician’s report indicating that the patient was mentally incapable of managing her own assets. (Emphasis added.)
"Under the will of Harry Whiting the patient inherited real property and was also named as beneficiary on a $100,000 trust and a residual estáte trust. By terms of the will the patient had the unqualified right to request withdrawals of the principal of the trust.
"We were unable to proceed with committee appointment as a result of the patient’s discharge. However, we did obtain a statement from the attending physician which clearly indicates that Leah Whiting cannot be considered capable of managing her own assets. I have discussed this with Mr. James Huber, Trust Officer at the Marine Midland Co. and I have urged him to consider presenting a petition for appointment of a conservator under Section 77 of the Mental Hygiene Law. We do not feel that an informal arrangement, such as power of attorney granted by the patient to an Elsie Stuhlmiller prior to her admission, should be continued. I am certain that Gowanda State Hospital would be willing to provide the necessary medical evaluations needed in conjunction with conservator appointment. [Emphasis added.]
"Please contact this office if you require any further information or assistance.”
Following receipt of the letter the Surrogate of Cattaraugus County, on his own motion, entered an order dated April 3, 1974 requiring the executor bank to advise that court of the status of the administration of the estate of Harry Whiting pending in that court; what, if any, steps were being taken to preserve the assets of that estate bequeathed and devised to Leah Whiting or placed in trust for her benefit and the position of the executor bank in reference to the validity of the power of attorney made by Leah Whiting in favor of Elsie Stuhlmiller.
Upon the return of the order the attorneys for the executor bank advised the Surrogate’s Court that upon receipt of the advice from the Department of Mental Hygiene and solely because of that advice the executor bank had refused and continued to refuse to honor the power of attorney. The attorneys further advised that the executor bank was going to seek appointment as a conservator of Leah Whiting. Motion by the executor bank that all proceedings in Surrogate’s Court be adjourned indefinitely was denied. The Surrogate ordered that the executor bank advise the court again on or before *874 July 1, 1974 of the status of the administration of the estate and the progress concerning the appointment of a conservator.
Apparently distressed over the status of the outstanding power of attorney of August 23, 1973 appointing Elsie Stuhlmiller her sole attorney in fact and contending her competency, Leah Whiting executed a second general statutory power of attorney on May 3, 1974. In this instrument she named as attorney in fact Elsie Stuhlmiller and Franklin Herdeg, a cousin of Leah Whiting.
On July 1, 1974, in proceedings in Surrogate’s Court of Cattaraugus County, the attorneys for the executor bank advised the court that the executor bank continued to refuse to honor either the power of attorney made by Leah Whiting, dated August 23, 1973, or the power of attorney later made and dated May 3, 1974. The attorneys further advised that the executor bank had elected not to seek the appointment of a conservator in view of the assertion of competency made by Leah Whiting.
Counsel appearing for Leah Whiting advised the Surrogate’s Court that the refusal of the executor bank to honor either power of attorney was causing damage and injury to Leah Whiting, among other reasons, by clouding the validity of a will which she had executed; by forestalling the sale of certain real property, and more particularly, by terminating trust income required for her care and maintenance.
Counsel for Leah Whiting and counsel for the executor bank both conceded to the Surrogate that the issue outstanding was the validity of the powers of attorney and that the resolution thereof required a determination of the mental competency of Leah Whiting. Both counsel advised that their research disclosed no basis for jurisdiction of a Surrogate’s Court to make the requisite determination. The court suggested that appropriate proceedings be immediately instituted in a court having the necessary jurisdiction and adjourned the matter for ope month for advice on the commencement of litigation and the further administration of the estate.
By a summons and complaint verified the 18th day of July, 1974 this action, in Supreme Court, for a declaratory judgment was commenced. The verified complaint made by Leah Whiting, Elsie Stuhlmiller and Franklin Herdeg, as plaintiffs, seeks a declaration of rights in reference to the power of attorney granted by Leah Whiting to Elsie Stuhlmiller on August 23, 1973 and also a declaration of rights in reference *875 to the second power of attorney granted by Leah Whiting on May 3, 1974 to the same Elsie Stuhlmiller and Franklin L. Herdeg.
The answer of the Marine Midland Bank-Western admits all allegations of the complaint, except the alleged impropriety of the bank’s refusal to honor either power of attorney. The defense is that all of the facts and circumstances surrounding the admission and subsequent retention of Leah Whiting at the State hospital for the mentally ill, proceedings for the appointment of a committee, together with the conduct of her cousin, Franklin Herdeg, and her friend, Elsie Stuhlmiller in reference thereto, are indications and acknowledgments of mental incompetency sufficient to revoke the first power of attorney and prevent the effective execution of the second one. The number and complexity of the applicable statutory laws and regulations, together with the general application and seriousness of the factual situation presented, merits examination in depth.
The evidence produced upon the trial discloses that on December 29, 1973, the plaintiff, Leah Whiting, age 83, fell and fractured her left hip. She was later admitted on that day to the Gowanda State Hospital, a facility operated by the State of New York for diagnosis and treatment of patients suffering from mental illness.
The initial admission of Mrs. Whiting was by a certificate of a designee of a director of community services. The admitting physician at the Gowanda State Hospital was one Dr. Fehmi Hakim, a psychiatrist employed at that institution. He testified that in the afternoon of December 29, 1973, he received a telephone call from Dr. Frederick Kurtz, a local physician in the Gowanda area, advising that Leah Whiting had fallen and broken her hip and that he wished to send her to the local private Tri County Hospital, but that Mrs. Whiting refused to go. Dr. Kurtz inquired of Dr. Hakim if Mrs. Whiting could be admitted to the Gowanda State Hospital. The answer, as testified by Dr. Hakim, was: "I told him if she is properly certified and she comes in we will see if we can figure this out as soon as she is sent to the hospital”.
Presented to Dr. Hakim later that evening, upon the arrival of Leah Whiting by ambulance at Gowanda State Hospital, was a "Certificate of Examination by Director of Community Services or His Designee”. The certificate and an application for admission were signed by one Dr. Paul Lahvis, identified *876 on the form as "A Physician Designee of the Director of Community Services for the mentally disabled for the County of Cattaraugus”. Allusion has been made that Dr. Kurtz was related to Dr. Lahvis. A review of the record discloses no proof of that fact. If such relationship did exist, then it appears that the admission would have been improper. (See section 31.05 of the Mental Hygiene Law, providing in part: "(a) A person is disqualified from acting as an examining physician in the following cases: (1) if he is a relative of the person applying for the admission or of the person alleged to be mentally ill.”)
Article 31 of the Mental Hygiene Law contains detailed provisions covering all types of admissions to State hospitals for the mentally ill.
It is section 31.37 of article 31 of the Mental Hygiene Law that relates to an involuntary admission of a patient on the certificate of a director of community services or his designee. That statute (subd. [a]) provides that a director of a State hospital "may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or his designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others”. (Emphasis added.) The statute further provides (subd. [a]): "The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission.” Finally, the statute (subd. [a]) recites that within 72 hours after admission (Sundays and holidays excluded) "the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital”.
A review of the certificate of the designee of the director of community services and of his application for admission of the patient discloses nothing of a factual or diagnostic nature to support the conclusory printed statements that Mrs. Whiting "had a mental illness”, except the penned notation of the designee that "patient has been mentally ill for many years”. It is of the greatest significance that no proof confirming the existence of the alleged prior mental illness or specifying the nature of it, was ever produced to this court.
As to the compliance with the statutory requirement of confirmation by a staff physician "of the need for immediate hospitalization” prior to admission (Mental Hygiene Law, *877 § 31.39, subd. [a]), the evidence is that the admitting psychiatrist confirmed by physical examination the existence of the fractured hip. As to mental examination his testimony was as follows: "Communication was very hard with her on account of her diminished hearing and maybe my accent. I guess some. And then I tried to interview her and she seemed to be suspicious and irritable but she was fairly cooperative enough to give me an idea. She said — I asked her if she was depressed and she said ’yes’ over the death of her husband and it was a rather short interview from the point of view of the mental examination. We were concentrating on the physical condition”.
A review of the certificate of the second examining physician filed within 72 hours contains a dirth of factual information to support his conclusion that the patient was so mentally ill that she required care and treatment in an institution for the mentally ill. The only psychiatric signs and symptoms which he noted under a subheading entitled: "Psychiatric signs and symptoms” were "patient seems irritable, difficult to communicate with”. A subheading on the certificate entitled: "Mental Diagnosis (if determined)” was left blank.
That there was a need for hospitalization and attendant medical and surgical treatment for the physical injury of Mrs. Whiting’s broken hip is clear. Recited "history of patient” disclosed it, completed subdivisions on the forms detailed it; and examinations confirmed it. The need for hospitalization in a State institution for treatment of mental illness of Mrs. Whiting, however, is another matter. No authority is needed to support the proposition that State hospitals for the mentally ill are not to be used as an accommodation to local physicians burdened with obstreperous patients. Neither are the facilities to be used for solely physical injuries. Finally, such hospitals are not to be considered as viable alternatives to local private clinics and hospitals.
The need for admission of Leah Whiting for treatment for a mental illness rests on the record before this court solely on the statements to that effect, couched in the conclusory language of the statute, printed on forms and signed by the involved physicians. Factual substantiation in support of those conclusions is woefully lacking.
The need and advisability of requiring a recitation of factual information sufficient to support the statutorily required opinion of (1) existence of mental illness and (2) the need for *878 inpatient care and treatment in a State hospital is clear. Without such information there is form without substance. It is equally clear that this is a matter which falls within the province of the Commissioner of Mental Hygiene. It is to that official that the Legislature has delegated the statutory obligation to "prescribe and furnish forms for use in procedures for admission”. (Mental Hygiene Law, § 29.01.) The importance of such forms is indicated by the further statutory provision that "admission shall be had only upon such forms.” (Mental Hygiene Law, § 29.01.) The commissioner has recognized this duty and has directed numerous forms to be prepared. (See 14 NYCRR Appendix 1, Admission Forms.)
This court finds no fault with the forms which the Commissioner of Mental Hygiene has designed. Subtitles for requisite information and blank spaces to provide that information are included. (See prescribed forms in 14 NYCRR Appendix 1, Admission Forms.) What is lacking is a requirement that the forms be completed as a prerequisite to admission.
If such a requirement exists it is unknown. The applicable statute provides that admission will be "in a form prescribed by the commissioner giving such information as he may deem appropriate. ” (Mental Hygiene Law, § 31.37, subd. [b]; emphasis added.) Recourse to the rules and regulations of the commissioner to discover what information he has deemed appropriate and required discloses that detailed admission procedures have been prepared. In fact, seven separate volumes of procedures have been prepared. They include "The Manual of Medical Administrative Procedures-State Hospitals”. (See 14 NYCRR 15.1 [c] [3].) Unfortunately, the manuals have not been filed with the Department of State and are thus not available for examination. The consequence is that any regulation requiring that the forms which the commissioner has prepared be completed is not only unknown and undiscoverable, but would be wholly ineffective in any event. Section 8 of article IV of the New York State Constitution provides that no rule or regulation made by any State department shall be effective until it’s filed in the office of the Department of State. When filed it is then an obligation of the Legislature to provide for speedy publication thereof. This constitutional provision has been supplemented by statutory enactment. (See Executive Law, § 102.)
In a landmark 1961 decision in People v Cull (10 NY2d 123), our Court of Appeals pointed out with crystal clarity the *879 application of this constitutional requirement to State agencies and departments. The court noted that the purpose of this provision was not only to provide notice, but to place in one central place where they could be found those codes, rules and regulations that had been enacted affecting a person’s particular interest.
Certainly administrative procedures for admission to State hospitals for the mentally ill affect every patient. It is from the operation of such procedures that the patient loses his most prized possession — his individual liberty. This court does not view it as arguable that such admission procedures relate merely to the organization or internal management of the Department of Mental Hygiene and thus fall within the exception to the filing and publication requirements under section 8 of article IV of the New York State Constitution. The interrelation between patient’s rights and admission procedures is so patent and so important that their filing with the Department of State and their publication must be considered a constitutional mandate and one that should be complied with immediately.
The scheme for admission to a State hospital for mental illness is clear. The statutes are to require a conclusion of the existence of mental illness. The regulations are to require the supportive proof. The absence of any effective rule or regulation leaves this court in the position of having to judge the subject admission of Leah Whiting solely in reference to the statutory law previously reviewed. The conclusory language of the statutes was recited and signed by the appropriate physician. So judged, the court finds the barest technical compliance with the statutory requirements for admission of the patient to the State hospital for the mentally ill.
Passing from the consideration of admission procedures to those of confinement, the proof is that Mrs. Whiting objected to her confinement to the State hospital on the day of her admission and expressed her desire to be in a private hospital.
"This patient was brought in on a Director of Community Services Certificate. She was lying on a stretcher because of fractured left hip sustained after falling in her home. She was a little upset when she found she was in Gowanda State Hospital, saying 7 want to be in Tri County Hospital not here’. She was alert and oriented” (Emphasis added). (Extract from "History of Patient, dated December 29, 1973” signed by *880 Dr. Fahmi Hakim, part of records of Gowanda State Hospital marked in evidence.)
The exercise of any rights on the part of the patient to secure release from the State hospital and transfer to a private facility presupposes the knowledge of such rights and that, in turn, notice of them. The admission of Mrs. Whiting was under section 31.37 of the Mental Hygiene Law. That statute does not set forth any peculiar requirements referable to admission procedures and notice in its provisions. What it does is incorporate by specific reference the provisions for notice, hearing, review and judicial approval that are applicable to involuntary admissions. (See Mental Hygiene Law, § 31.37, subd. [a], par. [2].) For the purposes of the incorporated requirements of notice, hearing, etc., of an involuntary admission the statute provides that "the date of admission of the patient shall be deemed to be the date when the patient was first received in the hospital under this [§ 31.37] section.” (Mental Hygiene Law, § 31.37, subd. [a].)
Involuntary admissions to a State hospital for the mentally ill are provided for under section 31.27 of the Mental Hygiene Law. The provision in reference to required notice for involuntary admissions (and thus by incorporation applicable to admissions by a director of community services or designee under section 31.37 of the Mental Hygiene Law) are found in section 31.29 of the Mental Hygiene Law.
Subdivision [a] of section 31.29 of the Mental Hygiene Law contains the requirement that notice of a person involuntarily admitted "be given forthwith to the mental health information service. ” (Emphasis added.)
Subdivision [b] of section 31.29 of the Mental Hygiene Law mandates the hospital director to give written notice of the admission of such person, "including such person’s rights”, "to the nearest relative” (par. 1) and to "as many as three additional persons, if designated in writing to receive such, notice by the person so admitted” (par. 2). (Emphasis added.) Notice to the relative or three additional persons is to be given "not later than five days excluding Sundays and holidays, after such admission”. (Mental Hygiene Law, § 31.29, subd. [b]; emphasis added.)
Note is made that despite its title "Involuntary admission on medical certification, notice of admission to the patient and others”, section 31.29 of the Mental Hygiene Law does not *881 contain a requirement that notice of anything be given to the patient.
The obligation to inform a patient of his or her status and rights is contained in a regulation adopted by the Commissioner of Mental Hygiene. 14 NYCRR 15.3 [c] provides: "Each patient shall be given notice of his or her status and rights at the time of admission to the facility in accordance with the procedures in the above-mentioned manuals”. The court has already noted that the referenced manuals have not been filed with the Department of State or published. (See notation to 14 NYCRR 15.1 [c] [l]-[7].) Thus, if the 83-year-old patient with a broken hip could have overcome the obvious practical difficulties of discovering the commissioner’s regulations outlining her status and rights immediately upon her admission it would have availed her nothing. The reference in the regulations to unfiled and unpublished manuals of procedure would be equally helpful if they referred to instructions in hieroglyphics of the pyramid of Rameses, the First. They should be filed and published. (N.Y. Const., art. IV, § 8; People v Cull, 10 NY2d 123, supra.)
What was prepared and served upon Leah Whiting was a form No. 461 entitled: "Notice of Status and Rights-Involuntary Admission”. It appears that a copy was also forwarded by mail to Mrs. Whiting’s cousin, Franklin Herdeg. The admission date of the patient as shown on the form was December 29, 1973. The form advises of the availability of the Mental Health Information Service. The form indicates an involuntary admission under "Sec. 31.27 MH Law”. It is dated January 2, 1974. It recites that a copy of the notice was served upon the patient on January 3, 1974. This was five days after the admission of the patient.
Whether the referenced form is viewed as a notice of status and rights under 14 NYCRR 15.3 [b], or a notice informing the patient of the availability of the Mental Health Information Service required under section 31.07 of the Mental Hygiene Law, or a combination of the two, it was not timely served upon the patient in any event. The regulation provides that notice of status and rights be given the patient "at the time of admission” and the statute provides that notice of the Mental Health Information Service be given the patient "immediately upon the admission”. This was not done.
As to service of the referenced notice on the Mental Health Information Service and the statutory requirement that notice *882 of involuntary admission be given "forthwith” to that agency (See Mental Hygiene Law, § 31.29, subd. [a], made applicable by Mental Hygiene Law, § 31.37), it appears that the same was received in the office of that agency in Buffalo, New York, on January 9,1974, 11 days after the admission of the patient, seven days after the date of the notice and six days after the patient was advised that the services of that agency were available to furnish information and help to her and others acting on her behalf.
The referenced notice indicates "copies to” Paul Lahvis, M.D. and Mrs. Whiting’s cousin, Franklin Herdeg. The copy served on Mr. Herdeg indicates that it was received on January 8, 1974. There is no evidence of how the copy was served. There is no evidence of when, if ever, a copy was served on Dr. Lahvis. Excluding Sunday, December 30, 1973, the holiday of January 1, 1974 and the Sunday of January 6, it appears that service on Franklin Herdeg was made on the seventh day following admission. This is not compliance with the statutory requirement that service be effected on the closest relative "not later than five days, excluding Sunday and holidays, after such admission”. (Mental Hygiene Law, § 31.29, subd. [b], made applicable by Mental Hygiene Law, § 31.27.)
Realistically, it made little difference when the required notices were served so long as they were not served before January 2, 1974. On that date, this 83-year-old patient underwent a surgical procedure for setting and pinning her left hip. Her subsequent confinement to bed and protracted recovery made her release and removal to a private facility a practical impossibility. This, the court finds, was the reason that Franklin Herdeg abandoned his efforts to secure Mrs. Whiting’s release by legal action. For the same reason, Mrs. Stuhlmiller modified her efforts to secure Mrs. Whiting’s release until such time as her release and transfer could be made in safety and without impairment to the patient’s health.
The court finds nothing in the conduct of the plaintiffs, Franklin Herdeg or Elsie Stuhlmiller that can properly be construed as an acknowledgment or agreement on their part that Mrs. Whiting had any mental illness, much less one that impaired her ability to manage herself or her affairs. Each continued to complain throughout Mrs. Whiting’s stay at the Gowanda State Hospital of her admission and confinement for mental illness and badgered available personnel to secure the patient’s earliest release and transfer to a private facility.
*883 It is section 78.01 of the Mental Hygiene Law that provides for the appointment of a committee for both an incompetent person and also for a patient who has been lawfully committed to a State facility for the mentally ill.
The statutory test for an alleged incompetent is whether or not such person "is incompetent to manage himself or his affairs by reason of. age, drunkenness, mental illness or other cause”. (Mental Hygiene Law, § 78.01.)
The statutory test for a lawfully committed patient in a State mental facility is whether or not the patient "is unable adequately to conduct his personal or business affairs.” (Mental Hygiene Law, § 78.01.)
In the case at bar it makes no difference which of the two tests is applied relative to the appointment of a committee for Leah Whiting. There is no evidence whatsoever that would be sufficient to meet either standard.
The record discloses the following as to the contentions of mental illness on the part of Leah Whiting and the nature thereof during her stay at the Gowanda State Hospital. The oral testimony of Dr. Fahmi Hakim was that his tentative diagnosis following his first and limited mental examination on the date of admission was schizophrenia paranoid state. This testimony conflicts with the "admission notes” signed by Dr. Hakim dated December 29, 1973 and forming a part of the hospital records, Exhibit A. The notes state "tentative diagnosis (293.0) psychosis cerebral arteriosclerosis”. The ultimate diagnosis by Dr. Hakim was "schizophrenia paranoid state (295.3)”. The discharge notes of March 13, 1974 in "History of Patient” state that the patient was "improved and not dangerous to herself or to others” and was "not referred for after care”. These notes were signed by Dr. Battersby.
Upon the trial, both Dr. Hakim and Dr. Battersby were sworn as witnesses. Each categorically denied that either had found Mrs. Whiting incapable of managing herself or her affairs by reason of age, drunkenness, mental illness or other cause. Each denied ever having made a finding of inability on the part of Mrs. Whiting to conduct her business or personal affairs. When confronted with the statement in the letter of F. H. Welch dated March 21, 1974 advising of the existence of a physician’s report indicating that Leah Whiting was incapable of managing her own assets, each denied having made a report to that effect to anyone. Finally, each denied knowledge *884 of the existence of a report expressing such finding made by any personnel at the Gowanda State Hospital.
Ms. Welch was not produced as a witness to give evidence concerning the existence of a physician’s report which she twice recited "clearly indicated” that "the patient (Leah Whiting) was incapable of managing her assets”. No reason was advanced for her nonappearance. What remains is a record before this court that is barren of anything that would support the statements contained in Ms. Welch’s letter of March 21, 1974 forwarded to the executor bank and to the Surrogate’s Court for advice and action. If a basis exists it must lie either in her misconception that any mental illness is sufficient basis for a determination of incompetency and the appointment of a committee, which it is not; or in her misconstruction of the effect of a determination of the need for involuntary care for mental illness, or a judicial retention order to provide such care. Section 29.03 of the Mental Hygiene Law was enacted for the sole purpose of providing that neither such order nor determination "shall be construed or deemed to be a determination or finding that such person is incompetent or is unable adequately to conduct his personal or business affairs”.
It appears that the procedures for the appointment of a committee for Mrs. Whiting had progressed to the point that the office of the Attorney-General had in fact drafted and forwarded a petition for the signature of the Director of the Gowanda State Hospital and had served a copy upon Franklin Herdeg, Mrs. Whiting’s cousin. Only the signature and acknowledgment of the director were required to complete the petition. The discharge of the patient before signature made further proceedings impossible.
On the issue of incompetency, the petition recited the bare printed conclusory statement "and is unable adequately to conduct her personal or business affairs”. This statement appears as a sort of an incidental 'by-the-by’ allegation in the middle of the paragraphs comprising folio two. It is obscured by a preceding allegation of date of admission and followed by a specification of how the patient was being retained. The petition did not have any medical report attached, nor did it refer to any. Neither was there any statement of facts relating to Mrs. Whiting’s alleged incompetency. Whether any regulatory admission procedure required medical or factual substantiation of the allegation is unknown. As we have seen, these *885 have not been filed in the Department of State and have not been published. What is known is that the applicable statute did contain a requirement that the petition state "facts showing that such patient is unable adequately to conduct his personal or business affairs”. (Mental Hygiene Law, § 78.07, subd. [b].) This should have been done. It was not; and the reason that it was not is that the petition drafted by the office of the Attorney-General was an outdated one prepared for use under former section 102 of the Mental Hygiene Law that required only a conclusory statement that a patient was unable adequately to conduct his personal or business affairs. That section (Mental Hygiene Law, § 102) as well as the entire former Mental Hygiene Law were repealed by the adoption of the new Mental Hygiene Law effective July 1, 1972, two years before the instant proceeding for a committeeship was commenced. (See L. 1972, ch. 251, §§ 1.01, 91.05.)
The facts in the case at bar point up the need for and the wisdom of the recent statutory revisions for the appointment of a committee. The referenced 1972 amendment requiring a statement of facts supportive of the allegation of incompetency was essential to the protection of the rights of the alleged incompetent. The more recent amendments adopted in 1974 are equally meritorious. In point of fact, they are more worthwhile than they appear to be known and practiced.
Acknowledging that a declaration of incompetency and an appointment of a committee strips a person of control of both his person and his property in contrast to a conservatorship, which is less restrictive of the individual and does not carry a stigma of judicial incompetency, the Legislature, by chapter 297 of the Laws of 1974, established a new statutory scheme of preference of conservatorship over committeeship.
By requiring that all petitions for a committeeship contain facts showing why a conservatorship would be inappropriate (Mental Hygiene Law, § 78.03, subd. [c]); by imposing a duty on the courts to consider whether the interest of a party could not best be served by a conservator before any appointment of a committee is made (Mental Hygiene Law, § 78.02) and by permitting a court to treat petitions for a committeeship as one for conservatorship (Mental Hygiene Law, § 77.04), a new legislative scheme was placed in our statutory law effective September 1, 1974. Note should be made by: (1) the officers in charge of State facilities for the mentally ill; (2) by personnel in the office of the Attorney-General charged with the prepa *886 ration of petitions for committeeships for such officers; and (3) by officers of the Mental Health Information Service, that the new requirements apply to petitions for committeeships when made by officers in charge of a State facility for the mentally ill under section 78.07 of the Mental Hygiene Law, even though the language of that section was not specifically altered by the 1974 amendments. The new statutory scheme of preference for conservator is to apply to all cases. (See Memorandum of State Executive Department to amendments contained in chapter 297 of the Laws of 1974, in McKinney’s Session Laws of 1974, p 1984, stating: "the bill would establish a statutory preference for the appointment of a conservator, thereby adopting the concept of ’the least restrictive alternative.’ This approach has been adopted by some courts in the state, but should be used in all cases. "(Emphasis added.)
Forms used prior to September 1, 1974 for the appointment of a committee should be corrected and previous procedures revised to conform to the new statutory requirements.
The evidence of the competency of Leah Whiting to conduct her personal and business affairs at the time of execution of the power of attorney of August 23, 1973 to and through the execution of the second power of attorney on May 3, 1974, and thereafter to the date of trial is overwhelming. This was the opinion of an eminently qualified psychiatrist who examined Mrs. Whiting at a nursing home shortly before the trial of the issues. Business associates of Mrs. Whiting, her Minister, relatives, neighbors and friends, all of long acquaintance, uniformly testified that in their opinion the acts and conduct of Mrs. Whiting were on August 23, 1973 and continuously thereafter those of a rational person. In truth, no testimony was given to the contrary. Physicians of the State hospital testified that they had no opinion of Mrs. Whiting’s incompetency to adequately conduct her personal or business affairs on the date either power of attorney was executed, or at any intervening time including her stay at the Gowanda hospital.
As a consequence, the record here does not present a question of permanent and continuing insanity, which if present would deprive a principal of capacity and thus destroy the authority of his attorney in fact the same as would death of the principal. (See Restatement, Agency, § 122; and Restatement, Agency 2d, § 122, Comment b).
Neither does the record present the more troublesome debatable and generally unresolved question arising from tempo *887 rary incapacity of a principal due to mental illness and its effect upon the authority granted by the principal. (Cf. original Restatement, Agency, § 122, Comment c reciting: "where the incapacity is only temporary, the authority of the agent may be merely suspended”, with Restatement, Agency 2d, § 122, wherein the later solons stated "the Institute expresses no opinion as to the. effect of the principal’s temporary incapacity due to a mental disease.” (See Snyder v Sponable, 1 Hill 567, 571, affd 7 Hall 427, wherein the court stated without distinction between temporary and permanent mental incapacity "and besides, married woman, infants, lunatics, and other persons not sui juris, are not, in general, capable of appointing an agent or an attorney”; and see only authoritative discovered case, Lewis v Commissioner of Banks, 286 Mass 570, wherein a decision of the Supreme Judicial Court of Massachusetts held that temporary insanity of a principal merely suspended the authority of the agent.)
Taking the most adverse view towards the position of the plaintiffs, the proof in the case at bar is only that Leah Whiting had a mental illness during her confinement at the Gowanda State Hospital, which mental illness never at any time rendered her incompetent to manage her personal or business affairs. On that proof and the additional proof of competency at the time of execution of each power of attorney and at all times intervening to the date of trial, the court finds that Leah Whiting was not incompetent by reason of mental illness and thus did not lack capacity to delegate to others what she had capacity to perform herself.
The statutory power of attorney executed by Leah Whiting on May 3, 1974 appointed Franklin Herdeg and Elsie Stuhlmiller attorneys in fact with express direction that they could act "severally”. While the power of attorney, did not expressly revoke the power of attorney of August 23, 1973 designating Elsie Stuhlmiller only as attorney in fact, the court finds it did so by necessary implication. A revocation of an agent’s authority need not be made by any particular act. Such revocation may be implied by words or conduct of a principal which are inconsistent with the continuation of authority. (See Restatement, Agency 2d, § 119; See 2A C.J.S., Agency, § 121, p. 743 and cases cited.) The grant of authority to Elsie Stuhlmiller and another, even though granted severally, the court finds is inconsistent with the prior grant of such authority to Elsie Stuhlmiller alone. (Cf. Copland v Mercantile Ins. *888 Co., 6 Pick. [Mass] 198 wherein a later grant of joint authority was held to revoke an agent’s earlier authority to act alone). Further, the original power of attorney contained no time limitation on its effectiveness. If no time is specified the authority of an agency terminates at the end of a reasonable period. (Restatement, Agency 2d, § 105.) Having encountered difficulty with having the first power of attorney recognized and honored by virtue of her confinement for mental illness and assertions of incompetency, it is easy to comprehend a rationale that a second power of attorney executed after release from confinement might be honored. The court finds a reasonable time for termination of the first power of attorney to be one which is coincident with the second attempt to delegate authority. Finally, it appears that after May 3, 1974, Elsie Stuhlmiller attempted to exercise the authority granted under the second power of attorney. This, the court finds, is a manifestation of consent on her part to a termination of the former power of attorney. Revocation of an agency can terminate by mutual consent. (See Restatement, Agency 2d, § 117.)
Decision is for the plaintiffs upon the findings made and reasons stated. It is ordered that the plaintiffs, Leah Whiting and Elsie Stuhlmiller have judgment as follows:
(a) ADJUDGING AND DECLARING that the power of attorney dated August 23, 1973 granted by Leah Whiting, as principal, to Elsie Stuhlmiller, as attorney in fact, was a valid and legal instrument unrevoked by alleged incompetency resulting from mental disease and lack of capacity on the part of Leah Whiting and was an effective instrument delegating to the attorney in fact the authority to perform the acts specified therein from the date of execution to the date of May 3, 1974.
(b) ADJUDGING AND DECLARING that the power of attorney dated August 23, 1973 granted by Leah Whiting, as principal, to Elsie Stuhlmiller, as attorney in fact, was revoked by implication and consent of the parties upon the execution of a second power of attorney made by Leah Whiting, as principal, to Elsie Stuhlmiller and Franklin Herdeg, as attorneys in fact, on May 3,1974, and it is further
ORDERED, that the plaintiffs, Leah Whiting, Elsie Stuhlmiller, and Franklin Herdeg, have judgment as follows:
(a) ADJUDGING AND DECLARING that the power of attorney dated May 3, 1974 granted by Leah Whiting, as principal, to Elsie Stuhlmiller and Franklin Herdeg, as attor *889 neys in fact, is a valid and legal instrument initially executed by a mentally competent principal and unrevoked by alleged incompetency resulting from mental disease and lack of capacity on the part of Leah Whiting, as principal, and is an effective instrument delegating to the attorneys in fact named therein the authority to perform severally the acts specified therein.
(b) That the plaintiffs recover the costs and disbursements of this action.